**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-06-415-03 |
| | § | |
| JESSE VALDEZ(3) *in custody* | § | |

## ORDER

Pending before the court is Jesse Valdez's motion to suppress evidence. Dkt. 43. Upon considerations of the motions and arguments of the parties, the evidence presented, and the applicable law, the court finds that Valdez's motion should be DENIED.

## BACKGROUND

In April of 2006, the DEA was conducting surveillance on Valdez and his co-defendants, Carlos Garza-Canales and Carlos Ramon Perez. According to the DEA, Canales and Perez spent the day driving around the area making a series of stops along their way at several houses. At a certain point, Canales and Perez met with a white van driven by Valdez. Canales got into the van with Valdez and drove away. The white van met with another vehicle, transferred a small package and continued to a residence at 10223 Heather Hills. Officers observed Canales leaving a package at the residence. Then Valdez drove to a Citgo gas station.

The surveillance team made the decision that the van should be stopped. So shortly before Valdez went to the Citgo station, the DEA called the Harris County Sheriff's Department for assistance. Deputy Sheriff Thomas met with a DEA agent to discuss the investigation. During their discussion, Thomas overheard radio traffic regarding the surveillance in progress. Thomas and the agent decided that if Thomas had probable cause, then he should stop the van. When the van left the station, Thomas followed in his patrol car.

Thomas pulled into the lane next to the driver's side of the van. When Thomas's patrol car was beside the van, he could see that Valdez was not wearing his seatbelt. Valdez was wearing a light-colored shirt making the absence of a dark shoulder strap all the more obvious. For safety reasons, Thomas dropped back behind the van and followed it for a few blocks. He then initiated a traffic stop.

As Thomas approached the car, he perceived the driver, Valdez, to be nervous. Valdez fumbled to find his insurance and would not make eye contact. He was nervous enough that Thomas instructed him to calm down. Thomas went back to his car and conducted the computer check on Valdez. He found prior drug history, but no outstanding warrants. Based on his years of experience, information from the DEA agent, and the nervousness of Valdez, Thomas went back and still retaining Valdez's driver's license, asked Valdez for permission to search the van. Valdez first gave oral consent. Then Valdez signed a voluntary consent to search form. Thomas observed that Valdez clearly spoke and read English with no difficulty. Once the consent form was signed, Thomas called dispatch to send a canine unit for the search.

Although Valdez was not under arrest, for Valdez's safety and in accordance with the policy of the Sheriff Department, Thomas placed Valdez in the back seat of the patrol car and closed the door while waiting for the canine team. While awaiting the arrival of the canine team, members of the surveillance team arrived. One member of the team, Officer Sidney Veliz of the Houston Police Department Narcotics Division, went to Thomas's cruiser to speak with Valdez. Veliz explained to Valdez that he had been under surveillance all day. He further told him that Valdez had been seen leaving a package at a residence not owned by Valdez. Valdez then admitted that he had "dropped 2 bricks" or 2 kilos of cocaine at the residence. Veliz asked Valdez for consent to search his home at 9819 Waving Fields. Veliz explained the consent to search form to Valdez, and Valdez

voluntarily consented to sign it.  In the meantime, the canine unit had arrived and searched Valdez's van.  Although the dog "alerted" on two separate areas of the van, no drugs were found.  After the search was complete, Veliz asked Thomas to accompany them to Valdez's home for the search to be conducted there.  During the search of the home, officers found 23 kilograms of cocaine and 32 ounces of marijuana.  Valdez was placed under arrest.

Jesse Valdez is charged with (1) conspiracy to possess with intent to distribute cocaine, and (2) aiding and abetting possession with intent to distribute cocaine.  Some, but not all, of the cocaine and marijuana at issue was found during the search of Valdez's home.  Valdez moves the court to exclude this evidence because the search was based on invalid consent obtained from Valdez as the result of an improper traffic stop.

### ANALYSIS

A traffic stop is considered a seizure for purposes of the Fourth Amendment prohibition against unreasonable searches and seizures.  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  The validity of a traffic stop is analyzed using the two-part inquiry set forth in *Terry*. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)).  "Under the two-part *Terry* reasonable suspicion inquiry, we ask whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 293 U.S. at 19-20).

Under the first prong of the test, the officer must have "an objectively reasonable suspicion that some illegal activity occurred" based on the "totality of the circumstances." *Id.* (citing *United States v. Arivizu*, 534 U.S. 266, 273, 122 S. Ct. 744 (2002); *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)).  The Fifth Circuit has stated that an "officer [needs to be able to] point to specific and articulable facts." *Id.*  Whether the officer was correct in his suspicions is not the test.

*United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (upholding a judge's finding of fact that

an officer believed the defendant was not wearing his seatbelt when stopped); *United States v. Jones*,

185 F.3d 459, 463-64 (5th Cir. 1999) (finding that the officer's observation of what he believed was

a traffic violation was sufficient to make the stop permissible under the Fourth Amendment).  Rather,

the court should review all the factors to determine if the officer had reasonable suspicion.

In the instant case, Thomas articulated to the court his reasons for initiating the stop.  He

observed from a short distance that the defendant was not wearing a seatbelt in violation of traffic

laws.  Valdez argues in his motion to suppress that Thomas could not have seen whether Valdez was

wearing a seatbelt.  Valdez was driving a panel van with no side windows except on the front doors

and a obstructed view through the back windows.  Moreover, in his motion Valdez claims that he

was, in fact, wearing his seatbelt.  Therefore, he argues that Thomas could not possibly have had a

reasonable suspicion of illegal activity.  The court disagrees.  Thomas testified with sufficient

particularity how he was able to observe the violation in progress.  Therefore, the traffic stop meets

prong one of the *Terry* test and was justified at its inception.

The second prong asks whether the stop was "reasonably related in scope to the

circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.  Once

the officer has run the computer checks and they have come back clean, reasonable suspicion has

come to an end and the suspect may not be detained any longer.  *Lopez-Moreno*, 420 F.3d at 430.

"A recognized exception to this rule is that if additional reasonable suspicion arises in the course of

the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue

until the new reasonable suspicion has been dispelled or confirmed." *Id.* (citing *United States v.

Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc); *United States v. Grant*, 349 F.3d 192, 196

(5th Cir.2003)).  Valdez argues that he was detained for an unreasonable length of time while he was

trapped in the back seat of Thomas's patrol car.  Further, he argues that the consent he gave to the search of his home was involuntary—the result of an interrogation by Veliz that was completely unrelated to the traffic stop.  Again, the court disagrees.

The length of Valdez's detention was reasonable. The combination of Thomas's evaluation of Valdez's demeanor and a positive criminal history check led Thomas to develop additional reasonable suspicion that Valdez was worried about something beyond a routine traffic stop.  Once consent had been given to search the vehicle, Valdez was detained for the time period it took to dispatch a canine unit from a different part of the county and search the van—a reasonable period of time.  Valdez argues that the consent to search his house was involuntary because it was completely unrelated to the traffic stop itself.  However, the subject matter of the questioning during a *Terry* stop is immaterial.  *United States v. Shabazz*, 933 F.2d 431, 436 (5th Cir. 1993).  Officer Veliz was entitled to ask Valdez questions on any matter he chose.

Additionally, Valdez argues that his consent was not voluntary because he was trapped in the back of the patrol car.   "To be valid, consent to search must be free and voluntary." *United States v. Olivier-Becerril*, 861 F.2d 424, 425 (5th Cir.1988).  The voluntariness of consent is a fact question to be determined by a review of the totality of the circumstances. *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993).  Voluntariness of consent involves six factors—no single one of which is dispositive. *Id.*

> (1) the voluntariness of the defendant's custodial status;
> (2) the presence of coercive police procedures;
> (3) the extent and level of the defendant's cooperation with the police;
> (4) the defendant's awareness of his right to refuse to consent;
> (5) the defendant's education and intelligence; and
> (6) the defendant's belief that no incriminating evidence will be found.

*Id.* At the hearing Veliz testified that Valdez was cooperative. In fact, Valdez volunteered the information that he had "dropped 2 bricks" at a residence earlier in the day. Before Valdez signed the voluntary consent to search form, Veliz explained it to him to make sure he understood it. However, Veliz also commented that Valdez appeared to understand and read English very well. The form itself contains the following language:

> I understand that I have the right to refuse to give this consent to search and can refuse to sign this form.
>
> I further state that no promises, threats, force, physical nor mental coercion of any kind have been used against me in order for me to agree to sign this document and to consent to the search(es) that I have authorized above.

Gov. Ex. 2. Although Valdez was sequestered in the back seat of the patrol car for his safety during the process, he was not arrested, handcuffed, or restrained in any other manner. And the defense has produced no evidence at all to suggest that Valdez's consent was involuntary. Therefore, the court finds Valdez gave voluntarily consent for the search of his house at 9819 Waving Fields. Accordingly, the second prong of the *Terry* test was met and the stop was constitutional.

### CONCLUSION

For the foregoing reasons, the court finds that Valdez gave voluntary consent for police to search his house pursuant to a valid *Terry* stop. Therefore, the defendant's motion to suppress is DENIED.

It is so ORDERED.

Signed at Houston, Texas on February 20, 2007.

_____
Gray H. Miller
United States District Judge